# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| OPTINVEST, LTD,<br><br>    Plaintiff,<br><br>    v.<br><br>MAGNA ELECTRONICS INC.,<br><br>    Defendant. | C.A. No. 22-1327-GBW<br><br>**DEMAND FOR JURY TRIAL** |

## OPENING BRIEF IN SUPPORT OF DEFENDANT
## MAGNA ELECTRONICS INC.'S MOTION TO DISMISS

Of Counsel:

John J. Kuster
Alex R. Rovira
Andres Barajas
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
jkuster@sidley.com
arovira@sidley.com
andres.barajas@sidley.com

YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
James M. Yoch, Jr. (#5251)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
jyoch@ycst.com

*Attorneys for Defendant*

Dated: December 8, 2022

**TABLE OF CONTENTS**

**Page**

NATURE AND STAGE OF THE PROCEEDING ...................................................1

SUMMARY OF ARGUMENT .............................................................................1

STATEMENT OF FACTS ....................................................................................3

    I.     The Bridge Loan Financing ..................................................................3

    II.    The Optinvest Note ..............................................................................4

    III.   The Magna Transaction..........................................................................6

    IV.   Optimus Ride's Defaults Under the Optinvest Note...................................8

    V.    Optinvest's Prior Litigation with Optimus Ride ..........................................8

    VI.   The Complaint....................................................................................9

ARGUMENT .....................................................................................................10

    I.     Legal Standard....................................................................................10

    II.    Optinvest's Claims Are Barred By the No-Action Clause .......................13

CONCLUSION ...................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akanthos Cap. Mgmt., LLC v. CompuCredit Holdings Corp.*,
677 F.3d 1286 (11th Cir. 2012) ...............................................................15

*Allied Cap. Corp. v. GC-Sun Holdings, L.P.*,
910 A.2d 1020 (Del. Ch. 2006) ......................................................11, 13, 14

*In re Amarin Corp. PLC Sec. Litig.*,
689 F. App'x 124 (3d Cir. 2017) ..................................................................1, 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................11

*Balles v. Babcock Power Inc.*,
476 Mass. 565 (2017) ........................................................................12

*Baybank Middlesex v. 1200 Beacon Props., Inc.*,
760 F. Supp. 957 (D. Mass. 1991)......................................................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................11

*Burkhart v. Genworth Fin., Inc.*,
275 A.3d 1259 (Del. Ch. 2022) ........................................................14

*In re Chemours Co. Sec. Litig.*,
587 F. Supp. 3d 143 (D. Del. 2022)........................................................1, 8, 11

*Cox Commc'ns, Inc. v. T-Mobile US, Inc.*,
273 A.3d 752 (Del. 2022), *reargument denied* (Mar. 22, 2022) ..............3, 12, 14

*E. Hedinger AG v. Brainwave Science, LLC*,
363 F. Supp. 3d 499 (D. Del. 2019)....................................................10

*Elliott Assocs., L.P. v. Bio-Response, Inc.*,
1989 WL 55070 (Del. Ch. May 23, 1989)............................................16

*Ernst v. Film Prod. Corp.*,
264 N.Y.S. 227 (Sup. Ct. 1933)..........................................................15

*Feldbaum v. McCrory Corp.*,
   1992 WL 119095 (Del. Ch. June 2, 1992)......................................................*passim*

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) ...............................................................................11

*HostForWeb Inc. v. Frank*,
   2021 WL 2808526 (D. Del. July 6, 2021) ...........................................................11

*Lange v. Citibank, N.A.*,
   2002 WL 2005728 (Del. Ch. Aug. 13, 2002) .......................................15, 18, 20

*Lorillard Tobacco Co. v. Am. Legacy Found.*,
   903 A.2d 728 (Del. 2006) .............................................................................12, 14

*Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*,
   261 A.3d 1199 (Del. 2021) .................................................................................13

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
   859 F. Supp. 743 (S.D.N.Y. 1994), *rev'd in part on other grounds*,
   65 F.3d 1044 (2d Cir. 1995) ...............................................................................15

*O'Boyle v. Braverman*,
   337 F. App'x 162 (3d Cir. 2009) ..........................................................................8

*Optinvest, Ltd. v. Optimus Ride, Inc.*,
   No. 2021-027672-CA-01 (Fla. Cir. Ct. July 21, 2022) ........................................9

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
   23 N.Y.3d 549 (2014) .........................................................................................15

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
   2013 WL 3233130 (Del. Ch. June 20, 2013)......................................................16

*Renaissance Dev. Corp. v. Buca V, LLC*,
   146 F. Supp. 3d 261 (D. Mass. 2015)..................................................................12

*Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*,
   616 A.2d 1192 (Del. 1992) ..................................................................................12

*Tang Cap. P'rs, LP v. Norton*,
   2012 WL 3072347 (Del. Ch. July 27, 2012) .......................................................16

iii

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)..............................................................................2, 8, 11

*Victor v. Riklis*,
   1992 WL 122911 (S.D.N.Y. May 15, 1992) ......................................................15

*Winer Family Tr. v. Queen*,
   503 F.3d 319 (3d Cir. 2007) ........................................................................1, 11

**Statutes**

Delaware's Uniform Fraudulent Transfer Act sections 1304 and 1305...........*passim*

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ...........................................................1, 10

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff Optinvest, Ltd. ("Optinvest") filed a complaint (the "Complaint") on October 10, 2022, asserting that Defendant Magna Electronics Inc.'s ("Magna") purchase of certain assets of Optimus Ride Inc. ("Optimus Ride") for an amount in excess of $10,000,000 (the "Magna Transaction") constituted a fraudulent transfer under sections 1304 and 1305 of Delaware's Uniform Fraudulent Transfer Act (the "Claims").  Optinvest seeks the appointment of a receiver to recover in excess of $15,000,000 that Optimus Ride allegedly owes it under a promissory note issued by Optimus Ride in favor of Optinvest (the "Optinvest Note").[1]  On November 2, 2022, the Court entered an order approving a stipulation by the parties to extend the time that Magna has to respond to the Complaint to December 8, 2022.  Magna now moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint.

## SUMMARY OF ARGUMENT[2]

1.      Optinvest fails to state a claim upon which relief can be granted because the Claims are barred by the clear and unambiguous language of the no-

---

[1] The Optinvest Note is annexed hereto as Exhibit A.

[2] The documents addressed in this brief are referenced in the Complaint and the Court may consider them upon this motion.  *See In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 128 n.6 (3d Cir. 2017) (citing *Winer Family Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007)) (noting that at the motion to dismiss stage the court "may rely on, in addition to the complaint itself, documents incorporated by reference and undisputed in authenticity"); *see also In re Chemours Co. Sec. Litig.*,

action clause (the "No-Action Clause") in the Optinvest Note. The Optinvest Note is one of several identical promissory notes (collectively with the Optinvest Note, the "Notes") that Optimus Ride issued to multiple bridge financing lenders (the "Noteholders"). Optinvest Note at 4. The Notes govern certain collective rights of the Noteholders, such as the right to enter into an agreement with Optimus Ride to modify or amend terms and provisions of the Notes, and the right to consent to a lawsuit brought under the Notes by a fellow Noteholder as an exception to the No-Action Clause. *Id.* at 3–4. Optinvest knowingly and willingly agreed in advance that it would be subject to the collective action of the majority of similarly situated creditors as set forth in the No-Action Clause. It cannot now, long after its agreement to collective action, assert its own individual fraudulent transfer claims attacking a transaction that the majority of Noteholders approved.

2.      The Claims allegedly arise from Optimus Ride selling its assets to Magna for less than reasonably equivalent value, Compl. ¶42, which caused Optimus Ride to have "no [remaining] assets to satisfy its outstanding liabilities, including to Optinvest." *Id.* ¶43. But courts routinely hold that no-action clauses (like the one at issue here) bar a plaintiff from bringing precisely these kinds of

---

587 F. Supp. 3d 143, 153 (D. Del. 2022) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)). All documents referenced in this brief are included in Exhibits filed contemporaneously herewith and adopted herein by reference.

fraudulent transfer claims without first satisfying the requirements of the no-action clause.  Here too, Optinvest's Claims fall plainly within the scope of the No-Action Clause in the Optinvest Note.  Therefore, under the clear language of the Optinvest Note, to pursue the Claims Optinvest was required to obtain "the written consent of the holders of at least a majority of the aggregate amount of outstanding principal under the Notes…."  Optinvest Note at 3.

3.      Optinvest does not allege that it has satisfied the requirement in the No-Action Clause.  Accordingly, Magna respectfully submits its motion is straightforward, and must be granted in full.  Optinvest's Claims are clearly barred by the No-Action Clause in the Optinvest Note, and therefore fail to state a claim as a matter of law.

<u>**STATEMENT OF FACTS**[3]</u>

**I.      The Bridge Loan Financing**

Optimus Ride is a Delaware corporation that formerly developed autonomous, self-driving vehicles.  Compl. ¶6.  In early 2021, Optimus Ride

---

[3] The facts set forth herein are based upon the allegations of the Complaint and are accepted as true only for purposes of this motion.  However, legal documents, including agreements and notes, are quoted or referenced directly as their plain language controls over a plaintiff's characterization of them.  *See Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022), *reargument denied* (Mar. 22, 2022) (stating that "Delaware adheres to an objective theory of contracts" that "places great weight on the plain terms of a disputed contractual provision," and "a contractual provision is not rendered ambiguous simply because the parties in

explored the possibility of a SPAC transaction ("SPAC Transaction"). *Id.* ¶9.

Optinvest alleges that Optimus Ride sought a bridge loan in an effort to continue to

fund its operations while it worked on finalizing the SPAC Transaction. *Id.* ¶¶9,

14.

The Complaint alleges that Optimus Ride reached out to several potential

lenders for a bridge loan in February 2021. *Id.* ¶11.  Optimus Ride began

negotiations with multiple lenders, one of which was Optinvest. *Id.* ¶12.  In March

2021, Optinvest agreed to fund a portion of the bridge loan, and Optimus Ride

issued Optinvest the Optinvest Note in favor of Optinvest in the principal amount

of $10,000,000. *Id.* ¶15; Optinvest Note at 1.  Multiple other lenders also executed

their own promissory notes with Optimus Ride to fund the bridge loan, totaling an

amount in excess of $34,000,000 (the "Bridge Loan Financing").  Compl. ¶17;

Optinvest Note at 4.

## II.     The Optinvest Note

The Optinvest Note is governed by Delaware law.  Optinvest Note at 6.  The

Optinvest Note expressly provides that it is one of a series of Notes that Optimus

Ride issued in substantially the same form to the other Noteholders. *Id.* at 4.

Additionally, the terms and provisions of the Optinvest Note may be modified

---

litigation differ as to the proper interpretation" (footnotes omitted) (internal
quotation marks omitted)).

either (i) by a written agreement between Optimus Ride and the Noteholders holding a majority of the aggregate amount of principal outstanding under the Notes, or (ii) by a written agreement between Optimus Ride and Optinvest. *Id.* at 4.

The Optinvest Note is a convertible promissory note that provides two different potential outcomes: (1) the Note would convert to shares or stock of Optimus Ride at the close of the SPAC Transaction; or (2) immediately upon the Sale of Optimus Ride prior to the Maturity Date[4] or conversion of the principal and interest hereunder, an amount equal to "1.5x the outstanding principal balance" of the Note plus accrued and unpaid interest thereon "shall accelerate and become immediately due and payable in full satisfaction of this Note." Compl. ¶16; Optinvest Note at 1–2.

The Optinvest Note expressly provides for three Events of Default, two of which are relevant here: (1) Optimus Ride allegedly failing to "pay any of the principal, interest or any other amounts payable under this Note when due and payable"; and (2) Optimus Ride filing "any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the

---

[4] The Maturity Date of the Optinvest Note was "the earlier of (i) June 30, 2022 and (ii) the business day immediately preceding the date on which [Optimus Ride] closes a business combination with a special purpose acquisition company." Optinvest Note at 1.

relief of, or relating to, debtors" or seeking "appointment of a custodian, receiver, trustee…." Optinvest Note at 2.

The Optinvest Note contains a paragraph granting Optinvest with certain remedies, _provided_ that Optinvest first complies with the requirement in the No-Action Clause. _Id._ at 3. The relevant paragraph provides:

> Upon the occurrence of an Event of Default, [Optinvest] shall have then, or at any time thereafter, all of the rights and remedies afforded creditors generally by the applicable federal laws or the laws of the Commonwealth of Massachusetts; **provided that [Optinvest], by countersigning below, agrees not to pursue any such rights or remedies unless and until such action is approved by the written consent of the holders of at least a majority of the aggregate amount of outstanding principal under the Notes**….

_Id._ (emphasis added). Optinvest does not allege that it has satisfied the requirement in the No-Action Clause by obtaining the required consents from the other Noteholders to pursue its Claims.

## III.   The Magna Transaction

Optimus Ride pulled out of the planned SPAC Transaction and informed Optinvest of that fact in or around May or June 2021. Compl. ¶18. After considering its options, Optimus Ride began to explore the possibility of selling certain of its assets to Magna. _Id._ ¶¶19, 21–23. Optinvest alleges that at the end of 2021, Optimus Ride sent it a consent letter ("Consent Letter")[5] to inform Optinvest

---

[5] A copy of the Consent Letter is annexed hereto as Exhibit B.

about its interest in selling its principal assets to Magna for an approximate amount of $10,000,000. *Id.* ¶23. The Consent Letter provides that each undersigned Noteholder irrevocably and unconditionally consents to the Magna Transaction, "acknowledges and agrees that the Magna Transaction does not constitute a fraudulent transfer under the U.S. bankruptcy code or any applicable state law," and "agrees that it shall not pursue any rights or remedies under its applicable Convertible Notes against Optimus [Ride] or Magna, and that it shall not sign any written consent or otherwise facilitate any other Noteholder's pursuit of any rights or remedies under the applicable Convertible Notes against Optimus [Ride] or Magna…." Consent Letter at 1–2. Optinvest did not sign the Consent Letter, but six other Noteholders holding a majority of the aggregate principal amount of the Bridge Loan Financing consented. Compl. ¶23; Consent Letter at 3–8. On December 31, 2021, Optimus Ride completed the Magna Transaction thereby selling certain of its assets to Magna for just over $10,000,000. Compl. ¶¶28–29.

After completing the Magna Transaction, Optimus Ride executed an assignment for benefit of creditors ("ABC") in Massachusetts and an assignee ("Assignee") was appointed. *Id.* ¶32. Optinvest alleges that the net proceeds from the Magna Transaction were transferred to the Assignee in the ABC proceeding with a $2,000,000 holdback. *Id.*

7

## IV.    Optimus Ride's Defaults Under the Optinvest Note

The Complaint alleges that "[n]o payments have ever been made on the Optinvest Note," *id.* ¶15, and that Optimus Ride "executed an assignment for benefit of creditors…in Massachusetts" following the closing of the Magna Transaction. *Id.* ¶32.  Under the Optinvest Note, Optimus Ride's failing to pay Optinvest and its executing an ABC both qualify as Events of Default.  Optinvest Note at 2.  These two Events of Default under the Optinvest Note triggered Optinvest's ability to pursue its available rights and remedies, subject to the No-Action Clause.  *Id.* at 3.

## V.    Optinvest's Prior Litigation with Optimus Ride[6]

On December 27, 2021, four days before the Magna Transaction closed, Optinvest filed a complaint against Optimus Ride in Florida state court seeking damages and an injunction to enjoin the Magna Transaction (the "Optimus Ride Litigation").  *See* Complaint for Monetary Damages and Injunctive Relief ¶¶29, 38, 47, 55, 61, *Optinvest, Ltd. v. Optimus Ride, Inc.*, No. 2021-027672-CA-01 (Fla. Cir. Ct. Dec. 27, 2021).  Optimus Ride filed a motion to dismiss on various grounds, including lack of proper venue, failure to comply with the No-Action

---

[6] The Court may take judicial notice of court documents from state court proceedings.  *See O'Boyle v. Braverman*, 337 F. App'x 162, 164–65 (3d Cir. 2009); *see also In re Chemours Co. Sec. Litig.*, 587 F. Supp. 3d at 153 (citing *Tellabs, Inc.*, 551 U.S. at 322).

Clause, failure to state a claim for fraud, and failure to state a plausible claim for injunctive relief to prevent the sale of Optimus Ride's assets because the Magna Transaction had already occurred by the time the complaint was served. *See* Defendant Optimus Ride Inc.'s Motion to Dismiss Plaintiff's Complaint and Supporting Memorandum of Law at 2–4, 2 n.1, *Optinvest, Ltd. v. Optimus Ride, Inc.*, No. 2021-027672-CA-01 (Fla. Cir. Ct. May 18, 2022). The Optimus Ride Litigation was voluntarily dismissed by Optinvest after the parties fully briefed Optimus Ride's motion to dismiss. *See* Notice of Dismissal Without Prejudice at 1, *Optinvest, Ltd. v. Optimus Ride, Inc.*, No. 2021-027672-CA-01 (Fla. Cir. Ct. July 21, 2022).

## VI. The Complaint

On October 10, 2022, Optinvest filed the Complaint against Magna, asserting the Claims under Delaware's Uniform Fraudulent Transfer Act based on Optinvest's status as a creditor of Optimus Ride. Compl. ¶¶34–54 (asserting claims under 6 Del. C. §§ 1304(a)(2), 1305, and 1307(a)(3)(b) and (a)(3)(c)). Tellingly, Optinvest does not allege that it has satisfied the requirement in the No-Action Clause by obtaining the required consents from the other Noteholders to pursue the Claims.

In the Complaint, Optinvest alleges that Optimus Ride did not receive "reasonably equivalent value in exchange for the assets it transferred to Magna" in

9

the Magna Transaction.  *Id.* ¶42.  As such, Optinvest further alleges that the proceeds of the Magna Transaction were not enough to "sustain Optimus Ride's operations at the time of the [Magna Transaction]" and that Optimus Ride was subsequently "saddled with enormous debts…with no assets to satisfy its outstanding liabilities, including to Optinvest."  *Id.* ¶43.

In bringing this Complaint, Optinvest asks the Court to, among other requests, "[a]ppoint[] a Receiver for the purpose of receiving and subsequently liquidating the Optimus Ride IP assets," "[r]equir[e] Magna to transfer ownership of the Optimus Ride IP assets to the Receiver," and "[a]uthoriz[e] and direct[] the Receiver to liquidate the Optimus Ride IP assets at a public sale" on behalf of all similarly situated creditors.  Compl. at 11.  In addition, Optinvest is seeking to recover damages in an amount in excess of $15,000,000 that is allegedly owed to it under the Optinvest Note.  Compl. ¶49; *id.* at 12.

## ARGUMENT

### I.      Legal Standard

In evaluating a Rule 12(b)(6) motion to dismiss, the Court conducts a "two-part analysis":  (1) "the Court separates the factual and legal elements of a claim, accepting 'all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions'"; and (2) "the Court determines 'whether the facts alleged in the complaint are sufficient to show…a plausible claim for relief.'"  *E. Hedinger AG v.*

10

*Brainwave Science, LLC*, 363 F. Supp. 3d 499, 504–05 (D. Del. 2019) (quoting

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009)).  To survive a

Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face,'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)), and must offer more than "labels and conclusions or a

formulaic recitation of the elements of a cause of action."  *Id.* at 678 (quoting

same) (internal quotations omitted).  In short, a complaint must include "factual

content that allows the court to draw the *reasonable inference* that the defendant is

liable for the misconduct alleged."  *Id.* at 678 (emphasis added).  In addressing a

motion to dismiss, "in addition to the complaint itself," the Court may consider

"documents incorporated by reference" by the complaint whose authenticity is not

in dispute.  *In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x at 128 n.6 (citing

*Winer Family Tr.*, 503 F.3d at 327); *see also In re Chemours Co. Sec. Litig.*, 587 F.

Supp. 3d at 153 (citing *Tellabs, Inc.*, 551 U.S. at 322).

The proper interpretation of language in a contract is a question of law, and

so "a motion to dismiss is a proper framework for determining the meaning of

contract language."  *HostForWeb Inc. v. Frank*, 2021 WL 2808526, at *7 (D. Del.

July 6, 2021) (quoting *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d

1020, 1030 (Del. Ch. 2006)) (internal quotation marks omitted).  The Optinvest

11

Note is governed by Delaware law.[7]  *See* Optinvest Note at 6.  Under Delaware

law, the objective of contract interpretation is to "determin[e] the intent of the

parties from the language of the contract."  *Cox Commc'ns, Inc.*, at 760; *see also*

*Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)

("When interpreting a contract, the role of a court is to effectuate the parties'

intent.").  Courts place "great weight on the plain terms of a disputed contractual

provision" and they "interpret clear and unambiguous terms according to their

ordinary meaning."  *Cox Commc'ns, Inc.*, 273 A.3d at 760 (footnote omitted)

(internal quotation marks omitted).  Delaware law provides that a party is bound by

the plain meaning of clear and unequivocal language in a contract.  *Lorillard*

*Tobacco Co.*, 903 A.2d at 739 (quoting *Rhone-Poulenc Basic Chems. Co. v. Am.*

---

[7] The Optinvest Note also references Massachusetts law in the remedies paragraph. Optinvest Note at 3.  Interpretation of language in a contract under Massachusetts law is similar to Delaware law.  *See, e.g.*, *Balles v. Babcock Power Inc.*, 476 Mass. 565, 571, 578 (2017) (noting that the "objective in interpreting contract is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose" and that "when the language of a contract is clear, it alone determines the contract's meaning" (citations omitted)); *Baybank Middlesex v. 1200 Beacon Props., Inc.*, 760 F. Supp. 957, 963 (D. Mass. 1991) ("Where the word of a contract is unambiguous, the contract must be enforced according to its terms….In interpreting a contract, the court must give effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible." (citations omitted)); *Renaissance Dev. Corp. v. Buca V, LLC*, 146 F. Supp. 3d 261, 265 (D. Mass. 2015) ("Absent an ambiguity, the court interprets a contract according to its plain terms, in a manner that gives reasonable effect to each of its provisions." (citations omitted) (internal quotation marks omitted)).

*Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del. 1992)); *see also Allied Cap. Corp.*, 910 A.2d at 1030 ("When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning."); *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) ("Delaware courts…enforce the plain meaning of clear and unambiguous language.").

## II.      Optinvest's Claims Are Barred By the No-Action Clause

Optinvest fails to state a claim upon which relief can be granted because the Claims are barred by the No-Action Clause. The No-Action Clause is in the following remedies paragraph, which provides:

> Upon the occurrence of an Event of Default, [Optinvest] shall have then, or at any time thereafter, all of the rights and remedies afforded creditors generally by the applicable federal laws or the laws of the Commonwealth of Massachusetts; **provided** **that [Optinvest], by countersigning below, agrees not to pursue any such rights or remedies unless and until such action is approved by the written consent of the holders of at least a majority of the aggregate amount of outstanding principal under the Notes**….

Optinvest Note at 3 (emphasis added). Events of Default occurred when Optimus Ride allegedly failed to pay amounts under the Optinvest Note when they became due and payable, and when Optimus Ride executed the ABC. Compl. ¶¶15, 32; Optinvest Note at 2. These Events of Default granted Optinvest with rights and remedies, subject to the No-Action Clause. Optinvest Note at 3.

The No-Action Clause is very broad in scope because it covers "*any such rights or remedies*" that Optinvest is granted in the remedies paragraph, *i.e.*, "*all of the rights and remedies afforded creditors generally.*"  *Id.* (emphases added).  In pursuing the Claims, Optinvest is attempting to pursue a remedy because it is seeking to recover amounts allegedly owed to it under the Optinvest Note.  Compl. ¶¶49, 54; *id.* at 12; *see also Burkhart v. Genworth Fin., Inc.*, 275 A.3d 1259, 1268 (Del. Ch. 2022) (stating that the Uniform Fraudulent Transfer Act, which Delaware has adopted, is "generally considered a remedial statute meant to facilitate the collection of other existing claims").  Therefore, the Claims fall plainly within the scope of the No-Action Clause and, under the clear language of the Optinvest Note, to pursue the Claims Optinvest was required to obtain "the written consent of the holders of at least a majority of the aggregate amount of outstanding principal under the Notes…."  Optinvest Note at 3.[8]  Optinvest does not allege that it has satisfied the requirement in the No-Action Clause and it will not be able to satisfy

---

[8] *See Cox Commc'ns, Inc.*, 273 A.3d at 760 ("[W]e interpret clear and unambiguous terms according to their ordinary meaning." (footnote omitted) (internal quotation marks omitted)).  Since Optinvest does not allege that it satisfied the requirement in the No-Action Clause, the Claims are barred under the language of that clause.  *See Allied Cap. Corp.*, 910 A.2d at 1030 ("When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning."); *see also Lorillard Tobacco Co.*, 903 A.2d at 739 ("When interpreting a contract, the role of a court is to effectuate the parties' intent.").

14

it because Noteholders holding a majority of the aggregate principal amount under the Notes signed the Consent Letter consenting to the Magna Transaction.

The conclusion that the Claims are barred by the No-Action Clause finds consistent support in case law.  Courts have held that a no-action clause bars a plaintiff from bringing fraudulent transfer claims without first satisfying the requirements of the no-action clause.  *See Feldbaum v. McCrory Corp.*, 1992 WL 119095 (Del. Ch. June 2, 1992) (dismissing fraudulent transfer claims where plaintiffs failed to comply with no-action clauses); *Lange v. Citibank, N.A.*, 2002 WL 2005728 (Del. Ch. Aug. 13, 2002) (same); *Akanthos Cap. Mgmt., LLC v. CompuCredit Holdings Corp.*, 677 F.3d 1286, 1295 (11th Cir. 2012) (same); *McMahan & Co. v. Wherehouse Entm't, Inc.*, 859 F. Supp. 743, 749 (S.D.N.Y. 1994), *rev'd in part on other grounds*, 65 F.3d 1044 (2d Cir. 1995) (same); *Victor v. Riklis*, 1992 WL 122911, at *6 (S.D.N.Y. May 15, 1992) (same); *Ernst v. Film Prod. Corp.*, 264 N.Y.S. 227 (Sup. Ct. 1933) (same); *but see Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 561 (2014) (agreeing with the holdings of *Feldbaum* and *Lange*, but distinguishing those cases to hold that a no-action clause that specifically referenced only rights under the indenture did not bar

securityholders' pursuit of independent claims not arising from the indenture agreement).[9]

The primary purpose of no-action clauses is to protect both issuers ("from the expense involved in defending lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors") and securityholders ("against the exercise of poor judgment by a single [security]holder or a small group of [security]holders, who might otherwise bring a suit against the issuer that most [security]holders would consider not to be in their collective economic interest"). *Feldbaum*, 1992 WL 119095, at *6 (citing *Commentaries on Indentures* §5.7 at 232 (1971)). No-action clauses "make it difficult for individual [security]holders to bring suits that are unpopular with their fellow [security]holders," by "delegating the right to bring a suit enforcing rights of

---

[9] The cases cited analyzed no-action clauses in agreements that were governed by New York law. However, the Delaware Court of Chancery "has observed that there are no pertinent distinctions between New York law and Delaware law in this area." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 2013 WL 3233130, at *12 (Del. Ch. June 20, 2013) (citing *Tang Cap. P'rs, LP v. Norton*, 2012 WL 3072347, at *5 n.15 (Del. Ch. July 27, 2012) (interpreting no-action clause in indenture governed by New York law and noting that "[n]either party has cited and I am not aware of any case law indicating that the principles of contract interpretation under New York law, so far as relevant to this case, differ materially from those under Delaware law") and *Elliott Assocs., L.P. v. Bio-Response, Inc.*, 1989 WL 55070, at *3 n.1 (Del. Ch. May 23, 1989) (interpreting no-action clause in indenture governed by New York law; stating that "there has been no showing that the law of New York differs from that of Delaware with respect to any of the matters at issue here" and concluding that "it appears to be of no consequence which authorities are relied upon")).

16

[security]holders to the trustee, or to the holders of a substantial amount of" the securities. *Id.* at \*5–\*6. Additionally, no-action clauses "ensure that the proceeds of any litigation actually prosecuted will be shared ratably by all [security]holders." *Id.* at \*6.

In *Feldbaum*, the Delaware Court of Chancery dismissed fraudulent transfer claims brought by a group of bondholders because they had not complied with the requirements for bringing suit set forth in the no-action clauses in the indentures governing their bonds.[10] *Id.* at \*8. The plaintiffs argued that their fraudulent transfer claims were not barred because the no-action clauses applied only to claims for breaches of express indenture provisions. *Id.* at \*6. The court rejected this argument, concluding that the legal theory a plaintiff advances does not determine whether a claim is barred by a no-action clause. *Id.* Instead, the court reasoned that "[g]iven the purposes for which no-action clauses are designed," no-action clauses cover "any claim that can be enforced by the trustee *on behalf of all bonds*…." *Id.* (emphasis added). Stated differently, because the purpose of no-action clauses is to protect bondholders' "collective economic interest," they cover any claim that that is common to all bondholders. *Id.* at \*6–\*7. The court went on

---

[10] The no-action clauses in *Feldbaum* provided: "[a] Securityholder may not pursue *any remedy with respect to this Indenture or the Securities* unless" the Securityholder satisfied certain requirements, including that "the Holders of at least a majority in principal amount of outstanding Securities make a written request to the Trustee to pursue the remedy…." 1992 WL 119095, at \*5.

to hold that the plaintiffs fraudulent transfer claims were common to all of the bondholders because they "allegedly arise from transactions by issuers of their bonds" and the plaintiffs could "allege no harm different from that suffered by their fellow bondholders and thus should share any remedy they receive on a *pari passu* basis with other bondholders." *Id.* at *8. Therefore, the no-action clauses barred the fraudulent transfer claims. *Id.*

In *Lange*, the Delaware Court of Chancery again dismissed fraudulent transfer claims brought by securityholders who did not comply with the requirements of a no-action clause. 2002 WL 2005728, at *7. Like the plaintiffs in *Feldbaum*, the *Lange* plaintiffs attempted to argue that the no-action clause did not apply to their fraudulent transfer claims. *Id.* at *6. The court followed *Feldbaum*'s reasoning and concluded that the plaintiffs' claims were common to all of the securityholders because their "ability to press those claims depends entirely on their ownership of the [securities] and the adverse effect that certain actions have allegedly had on each [security]holder, *pro rata* to her ownership of those securities." *Id.* at *7. Therefore, the claims were barred by the no-action clause. *Id.*

The Optinvest Claims are barred by the No-Action Clause under the rationale of *Feldbaum*. The Optinvest Note is one of several identical Notes that Optimus Ride issued to Noteholders in connection with the Bridge Loan

18

Financing.  Optinvest Note at 4.  The Notes are similar to the indentures in

*Feldbaum* because they govern certain collective rights of the Noteholders, such as

the right to enter into an agreement with Optimus Ride to modify or amend terms

and provisions of the Notes, and the right to consent to a lawsuit brought under the

Notes by a fellow Noteholder as an exception to the No-Action Clause.  *Id.* at 3–4;

*Feldbaum*, 1992 WL 119095, at *6 ("[A]ll rights and remedies of the indenture are

for the equal and ratable benefit of all holders.").  The No-Action Clause is similar

to the no-action clauses in *Feldbaum* because it requires a majority of Noteholders

to consent to a lawsuit brought under the Notes, which thereby protects

Noteholders (including Optinvest) against a single holder bringing a lawsuit that

most would consider not in their collective economic interest.  *Feldbaum*, 1992

WL 119095, at *6.

Additionally, like the plaintiffs' fraudulent transfer claims in *Feldbaum*,

Optinvest's Claims fall within the scope of the No-Action Clause because they can

be enforced on behalf of all Notes.  *Id.* at *6, *8.  In the Complaint, Optinvest

alleges that Optimus Ride did not receive reasonably equivalent value in exchange

for the assets Optimus Ride transferred to Magna in the Magna Transaction,

Compl. ¶42, which caused Optimus Ride to have "no [remaining] assets to satisfy

its outstanding liabilities, including to Optinvest."  *Id.* ¶43.  Optinvest is not

alleging that it has suffered any harm from the Magna Transaction different from

19

its fellow Noteholders.  *See Feldbaum*, 1992 WL 119095, at *8; *Lange*, 2002 WL 2005728, at *7.  Instead, Optinvest alleges that the Magna Transaction made it so Optimus Ride could not satisfy "its outstanding liabilities" *to all the Noteholders*, "*including* to Optinvest."  Compl. ¶43 (emphasis added); *see Lange*, 2002 WL 2005728, at *7 (holding that plaintiffs' fraudulent transfer claims were barred by the no-action clause because their claims "depend[ed] entirely on their ownership of the [securities] and the adverse effect that certain actions have allegedly had on each [security]holder, *pro rata* to her ownership of those securities").  Therefore, the Claims can be enforced on behalf of all Notes and for Optinvest to pursue them a majority of the Noteholders must first agree that it is in their collective interest to do so.  That has not happened here.

The Claims clearly fall within the scope of the No-Action Clause and are barred because Optinvest does not allege that it has satisfied the requirement in the No-Action Clause.

## CONCLUSION

For the foregoing reasons, the Complaint fails to state a claim upon which relief can be granted. Defendant Magna respectfully requests that the Court grant its motion to dismiss the Complaint.

|  | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
|---|---|

Of Counsel:

*/s/ James M. Yoch, Jr.*

James M. Yoch, Jr. (#5251)

John J. Kuster
Alex R. Rovira
Andres Barajas
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
jkuster@sidley.com
arovira@sidley.com
andres.barajas@sidley.com

Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
jyoch@ycst.com

*Attorneys for Defendant*

Dated: December 8, 2022

21