**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| OPTINVEST, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1327-JLH |
| | ) | |
| MAGNA ELECTRONICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION

Joseph B. Cicero, Gregory E. Stuhlman, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Gregory M. Garno, Thaddeus R. Kleckley, VENABLE LLP, Miami, Florida.

*Attorneys for Plaintiff*

James M. Yoch, Jr., Robert M. Vrana, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; John J. Kuster, Danica L. Muir, SIDLEY AUSTIN LLP, New York, New York.

*Attorneys for Defendant*

Wilmington, Delaware
September 30, 2026

**JENNIFER L. HALL, U.S. DISTRICT JUDGE**

This case arises from the sale of non-party Optimus Ride, Inc.'s ("OR's") assets to Defendant Magna Electronics, Inc. ("Magna"). Plaintiff Optinvest, Ltd. ("Plaintiff" or "Optinvest"), a disgruntled creditor of OR, asserts that the sale of OR's assets to Magna constitutes a constructive fraudulent transfer and seeks the imposition of a receiver. (D.I. 1.) Magna asks for summary judgment on the basis that Plaintiff cannot demonstrate a required element of its fraudulent transfer claim, namely, that OR didn't receive reasonably equivalent value for the transfer. (D.I. 87.) Having reviewed the parties' submissions (D.I. 88, 91, 92, 114, 115, 116, 123, 124, 125, 126) and the applicable law, the Court concludes that Magna's motion for summary judgment should be granted.

## I. BACKGROUND[1]

OR was an early-stage autonomous shuttle start-up company. (D.I. 91, Ex. 11 at 12563, 12574, 12582; *id.*, Ex. 1 at 19–20.) As an early-stage tech start-up, OR needed substantial capital. (*Id.*, Ex. 1 at 19–20; *id.*, Ex. 11 at 2603.) A November 2019 funding round valued the company at $165 million based on prior funding rounds. (D.I. 114, Ex. B at 1451.) Plaintiff provided some of OR's initial angel funding. (D.I. 76, Ex. C at 61202.)

[1] The record reflects that the following facts are not genuinely disputed for summary judgment purposes. Indeed, the parties do not dispute most of the relevant facts in this case. To the extent either party contends that any of the facts set forth below are disputed, the Court has determined that the dispute is not material, not "genuine," *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and/or that the facts establishing the dispute are not properly supported by the record under Federal Rule of Civil Procedure 56(c), (e). The Court recites only the facts necessary for resolving the legal issues presented by Magna's motion.

Although the Court cites Plaintiff's exhibits in this Opinion, the Court notes that Plaintiff simply attached its exhibits to its Memoranda of Law. (D.I. 76, 114.) Plaintiff provided no declaration attesting to the veracity of its exhibits.

Between 2020 and 2021, OR raised approximately $30 million from seven investors in the form of convertible promissory notes to fund its operations. (D.I. 91, Ex. 1 at 35–37; *id.*, Ex. 40A at 4553 (Sch. 2.05).) One of those investors was Plaintiff, which invested $10 million in OR via a convertible promissory note on March 3, 2021. (*Id.*, Ex. 13.)

In early 2021, OR began exploring fundraising initiatives such as a Special Purpose Acquisition Company ("SPAC") transaction, as well as potential strategic partnerships. (*Id.*, Ex. 11 at 2575–76; *id.*, Ex. 1 at 23–25.) OR sought advisors to assist it in evaluating SPAC transactions. During that process, potential advisors told OR it could be worth between $800 million and $3.2 billion if it met certain projections. (D.I. 114, Ex. E at 8795; *id.*, Ex. F at 8366; *id.*, Ex. G at 6588.) These valuations assumed OR would achieve hundreds of millions (and later, billions) in revenue per year and substantial margins. (*Id.*, Ex. E at 8795; *id.*, Ex. F at 8366; *id.*, Ex. G at 6587.) The valuations were conducted to solicit OR's business, and OR's management didn't believe they accurately reflected what OR could obtain in the marketplace.[2] (D.I. 91, Ex. 1 at 198–200, 202, 255, 257.)

OR retained Credit Suisse Securities (USA) LLC to assist with a potential SPAC transaction. (D.I. 91, Ex. 12; *id.*, Ex. 7 at 16; *id.*, Ex. 1 at 33–34.) By July 2021, Credit Suisse and OR had contacted nearly 40 SPAC sponsors and conducted multiple management presentations. (*Id.*, Ex. 1 at 121–23; *id.*, Ex. 10 at 3207–08.)

Early in the process, OR received an unsolicited offer from a SPAC investor called Lionheart. (D.I. 76, Ex. E at 9397; D.I. 91, Ex. 1 at 213–14.) Lionheart offered to invest $400 million, which implied a valuation in the range of $1.5 to $2 billion. (D.I. 76, Ex. E at 9397, 9409.)

[2] Plaintiff acknowledges that these valuations were made by the financial advisors for the purpose of "solicit[ing]" and "court[ing]" OR's business. (D.I. 115 ¶ 9; D.I. 114 at 2.)

Lionheart's valuation assumed OR would achieve $600 million in revenue in 2025 and $1.5 billion in 2026. (*Id.* at 9410; D.I. 91, Ex. 1 at 60–61.) OR management was surprised by the valuation and unsure whether Lionheart had the capital and expertise to assist OR. (D.I. 91, Ex. 1 at 32, 205–06 (noting that Lionheart was focused on real estate and had only completed one deal "in the hamburger business").)

The Lionheart deal ultimately fell apart because, based on its advisor's advice, OR felt that Lionheart wouldn't come through with the financing. (D.I. 91, Ex. 1 at 58, 63, 69.) Also, the SPAC market as a whole had deteriorated around that time, and funding had dried up for risky, early-stage companies. (D.I. 91, Ex. 1 at 75, 77, 86, 91–92, 122–23; *id.*, Ex. 7 at 78.)

Ultimately, OR was unable to close on a SPAC transaction. (D.I. 91, Ex. 1 at 121–22; *id.*, Ex. 7 at 71–73.) Credit Suisse reported to OR that potential SPAC sponsors were concerned about OR's "[a]bility to compete against broader autonomous competition"; the relative immaturity of its technology and its early stage; a lack of "[c]onfidence in ability to add differentiated value"; and "[e]xisting AV and EV concentration in light market conditions."[3] (*Id.*, Ex. 14 at 19518; *see also* Ex. 1 at 89–90; *id.*, Ex. 10 at 3207–08.) By late July 2021, OR determined that a SPAC transaction was no longer viable. (*Id.*, Ex. 1 at 119–20, 122; *id.*, Ex. 16 at 34115.)

---

[3] In Plaintiff's Response to Defendant's Statement of Undisputed Facts, Plaintiff "object[s]" to the Court's reliance on this statement and a couple others as "inadmissible hearsay." (D.I. 116 ¶¶ 7, 19, 23.) But "[t]he rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial." *Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (cleaned up). "The proponent need only 'explain the admissible form that is anticipated.'" *Id.* (citing Fed. R. Civ. P. 56, advisory committee's note to 2010 amendment). The challenged statements are cited here for at least the non-hearsay purposes of intent and effect on the listener. And, as Defendant points out, the statements likely fall under an exception to the rule against hearsay involving business records. (D.I. 123, 8 n.4 (citing Federal Rule of Evidence 803(6)).)

Instead, OR sought to raise money in other ways. (*Id.*, Ex. 1 at 123–24; *id.*, Ex. 16 at 34115.) OR retained Nomura Greentech as a financial advisor to help OR find a strategic partner or an acquirer. (*Id.*, Ex. 1 at 120, 124; *id.*, Ex. 16 at 34115.) Nomura advised OR that it would be critical to OR's capital raising efforts if OR's existing investors extended new bridge financing to show that OR had its investors' support and necessary funding. (*Id.*, Ex. 1 at 141; *id.*, Ex. 3 at 87–88; 194–95; *id.*, Ex. 16 at 34115.) OR reached out to its existing investors, yet only a single investor committed an additional $2 million across two notes. (*Id.*, Ex. 25 at 8078; *id.*, Ex. 3 at 88.) Otherwise, OR's existing investors—including Plaintiff—declined to participate in the bridge funding. (*Id.*, Ex. 23 at 45714; *id.*, Ex. 25 at 8078; *id.*, Ex. 3 at 85; *id.*, Ex. 1 at 140–41.) Plaintiff's principal stated that it declined to invest because OR was "nearing full cash burn." (*Id.*, Ex. 2 at 163.)

By early September 2021, Nomura had reached out to 34 investors, primarily international investment funds, but none indicated any interest in investing in OR. (*Id.*, Ex. 18 at 1174–76; *id.*, Ex. 6 at 83–87.) By Fall 2021, Nomura had contacted an additional 170 investors on behalf of OR. (*Id.*, Ex. 1 at 139, 157; *id.*, Ex. 18 at 1174–76; *id.*, Ex. 22 at 4467; *id.*, Ex. 6 at 83–87; D.I. 114, Ex. P at 43081; *id.*, Ex. V at 48081, 48086.) Although Nomura had opened a data room hosting due diligence materials regarding OR in late September 2021, most of the investors Nomura contacted quickly passed on the opportunity to invest in OR without requesting any additional information. (D.I. 91, Ex. 1 at 139–40; *id.*, Ex. 22 at 4466; *id.*, Ex. 3 at 193–94; D.I. 114, Ex. R at 228–29.)

One potential investor was Magna. (D.I. 91, Ex. 1 at 134.) Magna and OR had previously discussed partnership opportunities and Magna had previously considered investing in OR, but declined those opportunities. (*Id.*, Ex. 1 at 131, 133; D.I. 124, Ex. 42 at 91–93.) OR reached back

out to Magna in September 2021. (D.I. 114, Ex. T.) OR said that it was reaching out to Magna specifically "given the strength of the existing relationship[.]" (*Id.*) OR told Magna that it was "evaluating the best path forward for the company[,]" and that "a potential strategic transaction [] may be a better fit for the long-term success of the business." (*Id.*) OR connected Magna with its advisors at Nomura. (*Id.*)

Around that time, Nomura estimated that, based on a successful $150 million equity investment, OR would be valued at about $260 million to $430 million. (*Id.*, Ex. S at 46923.) But no such $150 million investment came.

By October 29, 2021, OR had participated in at least 25 management presentations with potential investors. (D.I. 91, Ex. 1 at 156–57; D.I. 114, Ex. V at 48084; D.I. 124, Ex. 46.) Yet OR failed to secure any funding or strategic partnership from the approximately 200 potential investors contacted. (D.I. 91, Ex. 1 at 139–40, 157.) OR's existing investors, including Plaintiff, declined further investment. (*Id.*, Ex. 1 at 140–41; *id.*, Ex. 2 at 162–63, 206.) Potential investors raised concerns, including [i] "[l]imited commercial traction" and "a lack of [a] proven, compelling value proposition and revenue trajectory"; [ii] the "[t]iming and viability of [OR's] path to achieving fully driverless operations at scale, given the size of investments and engineering teams for robotaxi companies that are still not achieving fully driverless operation at scale"; and [iii] a "[l]ack of long-term competitive advantage and differentiation over well-funded Robotaxi companies (e.g., Waymo, Cruise) that could easily enter the same target customer verticals with more advanced AV capability." (*Id.*, Ex. 38 at 3502; *see also id.*, Ex. 1 at 157, 159, 164–65; *id.*, Ex. 6 at 127–33.)

OR's board of directors determined, in consultation with its advisors, that given its financial position and its failure to obtain additional financing partners, it would focus on finding

a suitable buyer for the company. (*Id.*, Ex. 1 at 146–49; *id.*, Ex. 25 at 8085; *id.*, Ex. 24 at 1529; D.I. 114, Ex. V at 48084.) With Nomura's advice, OR contacted more than 30 potential acquirers. (D.I. 91, Ex. 6 at 136–37; *id.*, Ex. 31 at 5185–89; *id.*, Ex. 37 at 6274.) Most potential acquirers passed on the opportunity, and the ones that showed any interest at all expressed interest only in acquiring OR's engineers for little consideration, as opposed to buying OR's assets or intellectual property. (*Id.*, Ex. 31 at 5186–89; *id.*, Ex. 1 at 147.)

OR continued to communicate with Magna. (*Id.*, Ex. 1 at 150.) They discussed the business and that any transaction would likely be an "acqui-hire," meaning that Magna would acquire OR's staff. (D.I. 114, Ex. AA.) Magna conducted due diligence on OR, but was interested primarily in OR's workforce as opposed to the company itself. (D.I. 91, Ex. 31 at 1590–91; *id.*, Ex. 6 at 166–68; *id.*, Ex. 1 at 151–52; D.I. 114, Ex. AA.) Magna thought there was some value in OR's IP, but it wasn't the primary source of value. (D.I. 114, Ex. AA; *id.*, Ex. DD; D.I. 91, Ex. 1 at 152.) Magna felt it needed additional engineers and that OR's were "very talented and could help us in that regard." (D.I. 124, Ex. 43 at 42.) But Magna said that even a purchase of Magna's assets and employees "would be a tough one for us given that it will likely be challenging to retain engineers[.]" (D.I. 114, Ex. AA.)

Magna knew that OR was having financial difficulties based on its conversations with OR management and financial information in the data room. (D.I. 124, Ex. 43 at 44–45; D.I. 114, Ex. AA.) Magna determined that "6 or 7 million, plus a 30 percent premium, which equates to roughly $10 million, would be a reasonable price for us to pay." (D.I. 124, Ex. 43 at 48.) Some Magna employees described a potential acquisition of OR for $10 million as a "steal" because "it would be a good way to solve our talent problem" as compared to "the amount of work we would have to do to go outside and hire 135 engineers ourselves." (D.I. 114, Ex. BB; D.I. 124, Ex. 43 at 47–

48.) Yet Magna felt that OR's technology was "not mature and unlikely to be of much value." (D.I. 124, Ex. 43 at 51–52.) Given that OR was being marketed to other potential acquirers, Magna expected that its offer would be "[l]ikely low relative to other offers" and that other companies would likely make higher offers. (D.I. 124, Ex. 43 at 52–53; D.I. 114, Ex. BB.) Magna was wrong.

OR conducted negotiations with 12 of the 30 potential acquirers solicited, but ultimately only two—Magna and May Mobility—submitted bids. (D.I. 91, Ex. 1 at 154–55, 158; D.I. 114, Ex. DD at 53773.) Other players in the industry declined to bid at all because of the difficulty of integrating OR's engineers and IP. (D.I. 91, Ex. 32; *id.*, Ex. 33.) No potential investor—including Plaintiff—made an offer for OR's IP. (D.I. 91, Ex. 1 at 168, 254; *id.*, Ex. 2 at 206.) Magna bid $10 million for OR's assets, and May Mobility bid $5 million. (*Id.*, Ex. 1 at 155.)

After the bidding closed, and at Plaintiff's request, OR met with another bidder, Helbiz. (*Id.*, Ex. 1 at 165–66; *id.*, Ex. 2 at 182–83.) OR was still open to additional offers. (*Id.*, Ex. 2 at 182–83.) But Helbiz determined it was not interested in bidding because of OR's financial performance and because any autonomous-driving capability was still years away. (*Id.*, Ex. 2 at 185–86; *id.*, Ex. 3 at 176.) Plaintiff did not submit a bid for OR either. (*Id.*, Ex. 1 at 166.)

Left between only two options, with Magna's offer double May Mobility's, OR accepted Magna's $10 million bid. (*Id.*, Ex. 1 at 160.) OR felt that the Magna offer was "the best way to maximize the outcome for stakeholders, including the note holders, [and] equity holders" because the Magna offer was "the highest in terms of returning capital to investors, as well as maintaining the employment." (*Id.*, Ex. 1 at 250; *see also* Ex. 31 at 1591; *id.*, Ex. 3 at 119–20.) As a condition of closing, Magna required that the majority of the holders of OR's notes provide written consent to the transaction. (*Id.*, Ex. 39 at 417; *id.*, Ex. 1 at 172–73; *id.*, Ex. 4 at 48–49.) On December 27, 2021, the requisite majority of holders executed the consent letter, affirming that the Magna

transaction was the "most favorable offer" received and was in the best interest of OR's stakeholders. (*Id.*, Ex. 39 at 417–24; *id.*, Ex. 1 at 172–75.) Plaintiff did not sign the consent letter. (*Id.* (both citations).)

On December 31, 2021, OR and Magna executed an Asset Purchase Agreement documenting an asset sale pursuant to which Magna acquired the right to hire OR's engineering workforce and OR's assets, while expressly excluding OR's customer contracts, commercial operations, and general goodwill liabilities. (*Id.*, Ex. 40 at 393–94; *id.*, Ex. 3 at 200, 216–17; *id.*, Ex. 4 at 39–40.) Magna paid OR $11 million, net of $906,969.28 that Magna had advanced preclosing to cover OR's payroll to ensure that OR could retain its workforce through closing. (*Id.*, Ex. 40 at 393–94; *id.*, Ex. 4 at 36–39; *id.*, Ex. 1 at 161–62; D.I. 124, Ex. 43 at 82.)

The same day, OR executed an Assignment for the Benefit of Creditors, and an assignee was appointed to administer OR's estate and distribute the sale proceeds to creditors. (D.I. 91, Ex. 41.) Under the Assignment, the $10 million of sale proceeds were turned over to the assignee for the benefit of OR's creditors, and Plaintiff received more than $2 million in distributions from the assignee. (*Id.*, Ex. 41; *id.*, Ex. 1 at 177–78; *id.*, Ex. 2 at 230–31.)

## II. LEGAL STANDARD

A party may move for summary judgment under Federal Rule of Civil Procedure 56. Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the movant to demonstrate the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

"An assertion that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by 'citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other materials,' or by 'showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'" *Resop v. Deallie*, No. 15-626-LPS, 2017 WL 3586863, at *1 (D. Del. Aug. 18, 2017) (quoting Fed. R. Civ. P. 56(c)(1)(A) & (B)). The Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But a factual dispute is only genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To withstand a motion for summary judgment, the non-moving party "must point to concrete evidence in the record that supports each and every essential element of his case." *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). "[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (citing *Lauren W. v. DeFlaminis*, 480 F.3d 259, 266 (3d Cir. 2007)).

## III. DISCUSSION[4]

To prove a constructive fraudulent transfer,[5] the plaintiff bears the burden to show that the transferor was insolvent and did not receive reasonably equivalent value for the transfer. *In re Dura Medic Holdings, Inc. Consol. Litig.*, 331 A.3d 796, 839 (Del. Ch. 2025). Reasonably equivalent value "is not an esoteric concept: a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'" *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (citations omitted).[6] "Whether the [transferor] received 'reasonably equivalent value' depends on '(1) whether the transaction was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the asset transferred and the price paid.'" *In re Dura*, 331 A.3d at 839 (quoting *Seiden v. Kaneko*, No. 9861, 2015 WL 7289338, at *13 (Del. Ch. Nov. 3, 2015)); *see also, e.g.*, *Peltz v. Hatten*, 279 B.R. 710, 736–37 (D.

---

[4] The convertible note governing Plaintiff's investment in OR contains a no-action clause prohibiting Plaintiff from asserting certain claims without the consent of a majority of OR's noteholders. (D.I. 85, Ex. 14 at 13763.) The parties have cross-moved for summary judgment on Magna's affirmative defense that the no-action clause bars Plaintiff's claims. (D.I. 75, 83.) Plaintiff contends that, among other things, the no-action clause does not bar its claims because the no-action clause only prohibits claims brought under "the laws of the Commonwealth of Massachusetts" even though the note also provides that "[a]ll rights and obligations hereunder shall be governed by the laws of the State of Delaware[.]" (D.I. 85, Ex. 14 at 13763, 13766.) Earlier in this case, Magna moved to dismiss Plaintiff's claims as barred by the no-action clause because the parties intended the no-action clause to prohibit claims under Delaware law. (D.I. 7, 8.) The Court denied Magna's motion to dismiss due to the textual ambiguity but explained that "[i]t seems incredibly unlikely to me, given the context provided by this limited record, and the discussion [in] the case law about the purpose of No Action Clauses, that the parties intended that the note holders would be able to bring Delaware fraudulent transfer claims even though they could not bring Massachusetts fraudulent transfer claims." (D.I. 36; D.I. 85, Ex. 27 at 12–13.) Here, the Court assumes without deciding that the no-action clause does not bar Plaintiff's claims because Magna is nonetheless entitled to summary judgment.

[5] Plaintiff asserts only a constructive fraudulent transfer. (D.I. 1 ¶ 50.)

[6] Although Plaintiff's fraudulent transfer claim is brought under Delaware law, the parties agree that Delaware fraudulent transfer law is in accord with federal fraudulent transfer law.

Del. 2002) (applying same factors). Although this is a totality of the circumstances test, not a list of required elements, the Court will address each factor in turn.

The Court first addresses the third factor—the degree of difference between the fair market value of the asset transferred and the price paid. Plaintiff says no reasonable jury could find that OR did not receive fair market value. I agree. It is well established that

> in determining whether a value is objectively "reasonable" the court gives significant deference to marketplace values. When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight.

*Peltz*, 279 B.R. at 738 (citations omitted); *see also, e.g.*, *In re Samson Resources Corp.*, No. 15-11934, 2023 WL 4003815, at *25 (Bankr. D. Del. June 4, 2023) ("The easiest and most accurate way to determine the amount of money for which an asset can be exchanged is to do just that—exchange the asset for money or, more plainly, sell it."), *aff'd*, 2025 WL 2947024 (D. Del. Oct. 17, 2025); *In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 381 (Bankr. S.D.N.Y. 2013) ("The fair market value is equivalent to the winning bid accepted at an auction.").

Here, there is no genuine dispute that OR and its advisors conducted an open solicitation and bidding process involving numerous potential investors and resulting in OR accepting the highest bid. They first solicited investment from 200 potential investors and when that failed shifted to an open sales process. They solicited more than 30 potential acquirers and OR negotiated with 12. They received only two bids, and Magna's bid doubled the other. Plaintiff provided no evidence suggesting that the marketplace valued the assets sold by OR more than what Magna paid for them at the time of the transaction. Given those facts, there is no genuine dispute of material fact that OR received fair value for its assets. *See Edgewater Growth Cap. Partners LP v. H.I.G.*

*Cap., Inc.*, 68 A.3d 197, 229 (Del. Ch. 2013) ("[A] sale for value after an open market check does not constitute a fraudulent conveyance."); *Waterford*, 500 B.R. at 382 (explaining that the winning bid selected after "182 potential investors" were solicited "establishes that the transfer of the global assets was exchanged for reasonably equivalent value" and granting summary judgment on fraudulent transfer claim).

Plaintiff contends that OR did not receive fair market value because, according to Plaintiff, OR was under compulsion to do a deal. (D.I. 114 at 12–15.) Plaintiff points to the fact that OR was running out of cash. But that alone does not suggest that OR did not receive fair market value for its assets. *See Edgewater*, 68 A.3d at 202–03 (rejecting fraudulent transfer claim where the sold company "had been insolvent[,] . . . was unable to pay its bills, and thus any sales process had to be conducted in a timeframe that recognized that economic reality"); *see also In re Bayou Steel BD Holdings, L.L.C.*, 642 B.R. 371, 392 (Bankr. D. Del. 2022) (holding that the challenged transaction amounted to reasonably equivalent value even though "the Debtors were experiencing a severe liquidity crisis"). Plaintiff cites no case in which fair value was found lacking and suggestive of a fraudulent transfer because the seller was having financial difficulties.[7,8]

[7] Plaintiff's cases don't help it. *Amerada Hess Corp. v. C.I.R.*, 517 F.2d 75, 83 (3d Cir. 1975) was a tax case where the Third Circuit concluded that the property's fair value was the market price. *United States v. Cartwright*, 411 U.S. 546, 551 (1973), which was also a tax case, stated that the "willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves, and is not challenged here," and it relied on the market price of the assets. *United States v. Black*, 338 F. App'x 235, 239 (3d Cir. July 16, 2009) was a criminal case where the Third Circuit rejected the argument that foreclosure sales did not represent a reasonable estimate of value where there was no open market process and affirmed that value was reasonably based on the foreclosure sale. None of these cases support Plaintiff's fraudulent transfer claim.

[8] Plaintiff doesn't contend that the transaction doesn't amount to fair market value because OR previously had a higher valuation. Nor could it. It's undisputed that OR's earlier valuations

The Court might feel differently about granting summary judgment to Magna if there were any evidence in the record that another investor was interested in investing in or making an offer for OR. Or if there were any evidence suggesting that another investor would have paid more for OR's assets than what Magna paid for them in December 2021. There is none. On this record, no reasonable jury could find that OR did not receive fair market value.

The Court notes that it "is unaware of any case in which a transfer otherwise for reasonable equivalent value was transformed into one that was lacking because it was not arms-length or made in bad faith." *Bayou Steel*, 642 B.R. at 394. In any event, the Court proceeds to examine whether a reasonable jury could find that the transaction was not at arm's length or that the transferee did not act in good faith. It could not.

There is no genuine dispute of material fact that the transaction was conducted at arm's length. For the better part of a year OR and its advisors sought a variety of different investments from over 200 potential investors. They received no interest—not even OR's existing investors, including Plaintiff, were willing to invest sufficient funds. After those efforts failed, OR pivoted to a sale of the business and reached out to another round of potential buyers. OR received only two bids, and it took the higher one.

Magna was not an insider to OR and had no particular leverage over OR. Plaintiff contends that OR's CEO communicated with Magna, that Magna was a customer of OR, and that Magna knew that OR was having financial troubles. (D.I. 114 at 9–12.) But so what? Plaintiff cites no

---

were speculative, involved optimistic assumptions about OR's future revenue, and were outdated by the time of the transaction with Magna.

Plaintiff's evidence that one Magna employee believed that the sale was a "steal" (D.I. 114, Ex. BB) because "it would be a good way to solve [Magna's] talent problem . . . versus the amount of work we would have to do to go outside and hire 135 engineers ourselves" (D.I. 123, Ex. 43 at 47–48) is insufficient to raise a genuine dispute of material fact on the issue of fair market value.

case holding that those facts establish that a transfer was not at arm's length and therefore suggestive of a fraudulent transfer.[9] Those facts do not suggest that either OR or Magna were not acting in their own best interests—just the opposite. And no evidence suggests that Magna had access to any information unavailable to other potential bidders or that Magna received an advantage in the bidding process.

Plaintiff also makes a conclusory argument that the sales process was unreasonable. (D.I. 114 at 11–12, 12 n.2 (characterizing the sales process as "rapid" then asserting in a footnote that Magna "had not met its burden" on the issue of "whether or not the sales process undertaken was reasonable").) Plaintiff appears to contend that the sales process was flawed because it occurred quickly and a Nomura representative described it as "atypical."[10] (*Id.* at 12.) But even accepting that the sales process itself occurred quickly, it happened only after Nomura had reached out to

[9] Plaintiff's authorities are inapposite. *Slamon v. Carrizo (Marcellus) L.L.C.*, No. 23-1394, 2024 WL 4602673, at *6 (3d Cir. Oct. 29, 2024) was a breach of contract case holding that the relevant entities' relationship was at arm's length. *U.S. Bank National Association ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 583 U.S. 387, 389–90, 397 (2018) addressed the appellate standard of review for determining whether a person related to a debtor is a non-statutory insider in a bankruptcy case under a provision not applicable here (and the non-arm's length relationship was that the two parties were romantically involved). In *In re Sherman*, 67 F.3d 1348, 1356 (8th Cir. 1995), the transaction was not at arm's length because there was no open bidding process, no negotiation, no appraisal of the property, and no evidence that the transaction price represented fair market value. And in *Banner v. Kassow*, 104 F.3d 352 (2d Cir. 1996) (unpublished), the transaction was not at arm's length because the transferee was the transferor's personal attorney. None of those cases support Plaintiff's assertion that the transaction here was not at arm's length.

[10] The Nomura representative Plaintiff cites for this proposition stated that "I would not say that there was anything that departed from our normal processes, except for the fact that we would - - we were engaged in obviously a capital raise process and that happened to turn into a - - a sale process in a contracted timeline, which is not a typical process that Nomura would be involved in." (D.I. 91, Ex. 6 at 164.) The witness clarified that this circumstance "happens at times" and "is always viewed as a potential outcome." (*Id.* at 164–65.) The witness further explained that the work already done in soliciting a potential capital raise "was then leveraged for the M&A process" and that "there's nothing that comes to mind that was out of the norm of a typical engagement." (*Id.* at 166.)

over 200 potential investors and none (including Plaintiff) expressed interest. *See Edgewater*, 68 A.3d at 203, 225 (rejecting argument that sales process occurred too quickly to represent reasonably equivalent value where seller and its advisors conducted a "wide market check" and no other potential investor invested). Nor are there facts suggesting that the sales process was unreasonable given OR's financial circumstances or that any potential bidder was prevented from bidding. *See id.* at 203, 217 (noting that the plaintiff "has not identified one logical buyer who was not given a chance to buy" and that the rapid sales process "simply reflects that [the seller] had to find a buyer quickly because it had insufficient capital to run a longer process"); *Waterford*, 500 B.R. at 382 ("[U]nsubstantiated speculation" "about the sales process" "is insufficient to defeat summary judgment.") No reasonable jury could find that the transaction was not at arm's length or that the sales process was unreasonable.

Next is whether the transferee acted in good faith. Plaintiff has failed to identify evidence sufficient to raise a genuine dispute of material fact about Magna's good faith. Magna participated in an open sales process and made the highest offer—more than double the next best offer. Magna did nothing to improperly influence the bidding process, and there is no evidence of collusion, bid-rigging, or any similar misconduct. Magna made an offer it thought was commensurate for the risk it was taking on without giving up too much, and OR took that offer because it represented the best return for OR's stakeholders given the circumstances. No evidence in the record suggests otherwise.

Plaintiff contends that, "as a matter of law," a transferee does not act in good faith if it knows that the transferor is in "financial distress." (D.I. 114 at 15–16.) Plaintiff's authorities do

not support that proposition or its application here.[11] Although a transferee's knowledge of the transferor's financial issues can be relevant, it does not amount to a lack of good faith where the transferor otherwise received fair value. *See Bayou Steel*, 642 B.R. at 392–94; *Edgewater*, 68 A.3d at 202–03, 217–18.

Plaintiff does not cite any other facts from which a reasonable jury could find that Magna did not act in good faith. Plaintiff contends that Magna "had been aware of Optimus Ride's severe economic duress for months prior to the sale," and that "Magna advanc[ed] funds to allow Optimus Ride to make payroll[.]" (D.I. 114 at 16–17.) But Plaintiff does not explain how, in these circumstances, those facts could amount to a lack of good faith. Caselaw suggests they do not. *See Bayou Steel*, 642 B.R. at 392–93 (rejecting argument that transfer did not constitute reasonably equivalent value where "the Debtors were experiencing a severe liquidity crisis"); *Edgewater*, 68 A.3d at 217, 229 (similar). No reasonable jury could find that Magna did not act in good faith.

[11] Plaintiff's cited cases are readily distinguishable. *In re Vaso Active Pharmaceuticals, Inc.*, No. 10-10855, 2012 WL 4793241, at *6, 20 (Bankr. D. Del. Oct. 9, 2012) involved a payout to an officer and former officer of the debtor. *In re KB Toys, Inc.*, 470 B.R. 331, 343 (Bankr. D. Del. 2012) involved the disallowance of claims sold after the debtor had declared bankruptcy and the buyer was on notice that the claims might be disallowed. *In re World Vision Entertainment, Inc.*, 275 B.R. 641, 659–61 (Bankr. M.D. Fla. 2002) held that brokers selling debt instruments financing a Ponzi scheme did not act in good faith by failing to do any reasonable investigation into the legitimacy of the notes sold. *In re Jie Xiao*, 608 B.R. 126, 164 (Bankr. D. Conn. 2019) involved a phony divorce settlement intended to loot the debtor. *Garner v. First Nat'l City Bank*, 465 F. Supp. 372, 383, 383 n.15 (S.D.N.Y. 1979) was a conversion case where the subsequent purchaser was aware of facts suggesting that the property was converted. *In re LuMee LLC*, No. 19-24752, 2025 WL 1010211, at *6–9 (Bankr. D. Utah Apr. 3, 2025) involved transfers to an insider with knowledge that the debtor was insolvent. And *In re Chevrie*, No. 99-6542, 2001 WL 120132 (Bankr. N.D. Ill. Feb. 13, 2001) involved transfers of real estate from the debtor to his ex-wife intended to defraud creditors.

In sum, no reasonable jury could find, based on the relevant factors, that OR did not receive reasonably equivalent value for its assets.[12] Defendant is entitled to summary judgment on Plaintiff's constructive fraudulent transfer claim.

## IV. CONCLUSION

Defendant Magna Electronic Inc.'s Motion for Summary Judgment Based on Reasonably Equivalent Value (D.I. 87) will be granted. An appropriate Order will be entered.

[12] In a footnote and a conclusory closing paragraph of Plaintiff's answering brief, Plaintiff asserts that the Court should not grant summary judgment because there is a "battle of the experts." (D.I. 114 at 7 n.1, 20.) Yet in opposing Defendant's motion for summary judgment on reasonably equivalent value, Plaintiff never once cites any expert opinion—not in Plaintiff's memorandum of law in opposition to Magna's motion for summary judgment based on reasonably equivalent value (including Plaintiff's attached exhibits) (D.I. 114), not in Plaintiff's concise statement of undisputed facts in opposition to Defendant's motion for summary judgment on reasonably equivalent value (D.I. 115), and not in Plaintiff's response to Defendant's statement of undisputed facts in opposition to Defendant's motion for summary judgment on reasonably equivalent value (D.I. 116). Plaintiff never contends that any expert opinion generates any particular genuine dispute of material fact. Plaintiff's vague reference to a battle of the experts without making any specific argument as to how any expert opinion generates a dispute of fact and without even citing to an expert opinion is plainly insufficient to avoid summary judgment. Plaintiff has forfeited any argument that its expert opinion creates a genuine dispute of material fact.